**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**MIDLAND-ODESSA DIVISION**

| | |
|---|---|
| SEAN P. MCGRATH,<br><br>    *Plaintiff,*<br><br>v.<br><br>KYLEIGH BREWER, AS EXECUTOR OF THE ESTATE OF JOHNNY D. COPE, DECEASED; JONATHAN PATRICK COPE, INDIVIDUALLY; KYLEIGH BREWER, INDIVIDUALLY; AND DOES 1 THROUGH 10, INCLUSIVE,<br><br>    *Defendants.* | Case No.<br><br>**JURY TRIAL DEMANDED** |

## ORIGINAL PETITION FOR: (1) FRAUD; (2) CIVIL CONSPIRACY; (3) VIOLATION OF THE NEW MEXICO UNFAIR PRACTICES ACT; (4) VIOLATION OF THE NEW MEXICO UNIFORM SECURITIES ACT; (5) FRAUDULENT TRANSFER; AND (6) CIVIL CONSPIRACY

Plaintiff Sean P. McGrath ("Plaintiff" or "McGrath") files this Petition against Defendants Kyleigh Brewer as Executor of the Estate of Johnny D. Cope, deceased ("Estate"); Jonathan Patrick Cope, individually ("J.P. Cope"); and Kyleigh Brewer, individually ("Brewer"), and would respectfully show as follows:

### INTRODUCTION

1.    Plaintiff, Sean P. McGrath, brings this action to recover damages caused by a fraud and Ponzi scheme perpetrated by the late Johnny D. Cope ("Cope") and his co-conspirators, including career felon Michael Booth ("Booth"), Camilla Hoffman ("Hoffman"), and Randall Glessner ("Glessner"), who on information and belief may be deceased. Cope and Booth induced McGrath and multiple other investors to "loan" millions of dollars to shell entities, promising to

use the money to finance a golf cart operation and to repay the loans with a premium and interest. In reality, these conspirators created the shell entities to defraud the investors, pocketed a significant portion of the proceeds for their own use and enjoyment, and used the incoming money from newer loans to pay off older loans. After the fraud was exposed and new money stopped flowing in, the conspirators – *i.e.*, Cope, Booth, Hoffman, and Glessner – left multiple investors, including Plaintiff McGrath, holding the bag.

2.    On January 20, 2023, the United States District Court for the District of Massachusetts determined that this Ponzi scheme damaged McGrath in the amount of $3,107,195.43, the sum of which he seeks to recover from the named defendants herein.

3.    Unbeknownst to McGrath, Cope was a key participant from the outset of this elaborate conspiracy. Cope provided Booth access to an exclusive private club populated by millionaires and billionaires. There, he delivered potential investors to Booth and vouched for the legitimacy and safety of the business operation. Cope collaborated closely with Booth on the scheme and took affirmative acts to advance it, including opening one of the bank accounts used to facilitate and perpetuate the fraudulent financial transactions and paying settlement monies to eliminate litigation that could have ended the Ponzi scheme.

4.    While Cope has passed, his Estate remains jointly and severally liable to McGrath for McGrath's extensive Ponzi scheme losses. But the Estate, acting through and with Defendant Brewer and Defendant J.P. Cope, has been liquidating the Estate's assets for less than market value to prevent the Estate's various creditors, including those with claims against Cope for his role in the Ponzi scheme, from recovering from the Estate. In exchange for giving away the Estate's assets at a fraction of their value, J.P. Cope and potentially other beneficiaries of the Estate have

received valuable side deals with different counterparties in order to enrich themselves at the expenses of Cope's victims and creditors.

## II.    PARTIES

5.    Defendant Kyleigh Brewer is an individual, a resident of Texas, and an Independent Executor ("Executor") of the Estate of Johnny D. Cope, which was opened in the Probate Court of Midland County Texas and entitled *In the Matter of the Estate of Johnny D. Cope, Deceased*, Cause No. P20486 (the "Probate Action").  She may be served personally as a resident of Texas, and, in her role as Executor, by and through her Resident Agent of record, Michael C. Carper, at 1102 Main Street, Lubbock, Texas via certified mail.

6.    Defendant Jonathan Patrick Cope, upon information and belief, is an individual residing in Fort Mill, South Carolina and formerly served as Independent Executor of the Estate. J.P. Cope may be served at 124 Gragg House Road, Fort Mill, South Carolina 29713 via certified mail.

7.    Plaintiff Sean P. McGrath is an individual who at all relevant times hereto has resided in Weston, Massachusetts.  He maintains a second residence in Palm Desert, California.

8.    Additionally, the late Johnny D. Cope, deceased as of December 13, 2020, was an individual whose primary residence was located in Ruidoso, New Mexico.  Upon information and belief, Cope was a resident of New Mexico at all relevant times mentioned herein.

9.    Plaintiff is unaware of the true names and capacities of the defendants sued as DOES 1 through 10, inclusive (the "Doe Defendants"), and he therefore sues these defendants by fictitious names.  Plaintiff alleges upon information and belief, that each of the Doe Defendants is in some manner liable to Plaintiff.  Plaintiff will amend this Complaint to state the true names and

capacities of the Doe Defendants when their names and capacities, along with their responsibility for the actionable conduct alleged herein, have been ascertained.

### III.    JURISDICTION AND VENUE

10.    This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the parties are citizens of different states.  Specifically, the Estate and Brewer are citizens of Texas, J.P. Cope is a citizen of South Carolina, and Plaintiff is a citizen of Massachusetts.

11.    This Court has personal jurisdiction over the Executor/Estate, Brewer, and J.P. Cope because the Probate Action was opened in Midland County, Texas, and each of the Defendants purposely availed themselves of and consented to the jurisdiction of this Court by reason thereof.  Furthermore, by instrument filed in the Probate Action on October 12, 2021, the Executor appointed "Michael H. Carper, whose address is 1102 Main, Lubbock, Texas, to be the resident agent to accept service of process in all actions or proceedings with respect to [the Estate of Johnny D. Cope]."

12.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because the events or omissions giving rise to the claims and/or a substantial part of property that is subject of the action (*i.e.*, the Estate) are located in this judicial district and this judicial division therein.

### IV.    FACTUAL BACKGROUND

### <u>Michael Booth is Prolific Career Felon</u>

13.    Michael Booth has a well-documented history organizing and running Ponzi schemes.  In 1995, Booth pleaded guilty to "engaging in an advance-fee scheme whereby he would receive advance fees for financing leases with no intention, or capacity, to finance such."  *U.S. v.*

*Booth*, No. 99 CR 18, 2010 WL 5394879 (E.D. Wash. Dec. 23, 2010).  Booth was sentenced to 18 months in prison.

14.    Shortly after his release, Booth began orchestrating a new scheme, again using an equipment leasing business as a front.  As detailed in *U.S. v. Booth*, 309 F.3d 566 (9th Cir. 2002), Booth and his co-conspirator promised to find nearly $400 million in financing for distressed companies, which paid Booth nearly $2 million in advanced fees.  Booth and his co-conspirator were later found to have "spent the fees as they came in, on salaries for employees and for their own personal expenses, including, among other things, the rental of a jet airplane, automobile leases, jewelry, trips to Las Vegas, and golf lessons."  *Id.*  at 570.

15.    The Appeals Court noted this was not Booth's first foray into financial fraud, finding that "civil judgments for fraud [] had been entered against Booth in the past," and that he "had knowledge of the harm he would cause in taking advantage of desperate individuals because of harm he had caused to other individuals in the past."  *Id.* at 577.

16.    A later appellate court noted that the District Court had been justified in elevating Booth's sentence given "the sheer number of Booth's crimes and [] the fact that Booth had preyed on gullible victims and caused serious financial and emotional harm."  *U.S. v. Booth*, 200 F. App'x 678, 679 (9th Cir. 2006).  It confirmed "Booth had engaged in similar fraudulent activities in the past."  *Id.*

17.    Booth was convicted for multiple felony counts of wire fraud and money laundering.  Booth served over twelve years in a federal penitentiary.

### The Golf Cart Scheme

18.    After his release from federal prison in or about 2013, Booth moved to Coachella Valley in California.

---

19.    There, Booth began using a luxury golf cart business to serve as the front for a Ponzi scheme (the "Golf Cart Business").  The scheme worked as follows:  Booth and his co-conspirators established what appeared to be legitimate businesses that purchased golf cart chassis and parts, refurbished and assembled them into high-end golf carts, and sold them at a profit. Booth and his co-conspirators targeted wealthy individuals not only to buy golf carts, but also to invest in the Golf Cart Business.  The investors were told the Golf Cart Business was "highly profitable," but that it required short-term loans to finance the operation.  The investors were assured their loans would be fully repaid along with a premium and high rate of interest.

20.    In fact, Booth and his accomplices never intended to – nor did they – use the funds to finance the Golf Cart Business.  Instead, they used most of the money to fund their extravagant lifestyles and to pay back previous investors—*i.e.*, a classic Ponzi scheme.

## Johnny Cope's Role in the Golf Cart Scheme

21.    The Golf Cart Business was not solely Booth's enterprise.  Lacking his own connections, Booth needed co-conspirators to introduce him to potential targets to invest in his scheme, to persuade investors it was safe to invest in the Golf Cart Business, and to facilitate financial transactions when Booth's operation was under scrutiny.

22.    Johnny D. Cope fulfilled this role.  Cope held himself out as extremely wealthy and he socialized with those who were incredibly affluent.  Cope was a well-connected businessman with deep ties to Texas, New Mexico, and California.  The *Albuquerque Journal* described Cope as "a deal-maker, mover-and-shaker and kingmaker in state government and politics."  Thomas Cole, *Tycoon Backs Gov. All the Way; Hobbs Businessman Has Helped Raise Millions, But He's Had His Share of Controversy*, Albuquerque J., July 8, 2007, at A1.  However, Cope's "rise to the

top" was not "without troubles: business setbacks, a drug problem that led to jail time and a couple of stormy marriages that involved allegations of abuse." *Id.*

23.     Among other enterprises, Cope owned several racehorses and had deep ties to racetracks, casinos and gambling operations, including the Ruidoso Downs Race Track & Casino in Ruidoso, New Mexico, where Cope owned a multimillion-dollar home.

24.     Cope was an avid golfer and a longtime member and part-time resident of the exclusive Bighorn Golf Club in Palm Desert, California ("Bighorn"). Bighorn is widely recognized as one of the top private residential golf club communities in the country. It contained just the type of membership that Booth required to run his scheme; but, it has notoriously closed doors to outsiders and non-members.

25.     Cope and Booth became inseparable in the Coachella Valley. Upon information and belief, Booth and Cope's relationship extended back to before Booth served over a decade in federal prison.

26.     Cope was aware that Booth's Golf Cart Business was a fraudulent enterprise and that Booth was a repeat felon. Booth did not hide his criminal past from Cope. In fact, one of Booth's schemes tanked an established business in the Coachella Valley that left elderly investors penniless. Cope knew of this scheme because Booth and one of Cope's confidants, R.D. Hubbard, profited from it.

27.     While many of Booth's victims were not aware of the multiple high-interest loan transactions Booth entered into, Cope, a sophisticated businessperson, was a party to discussions with Booth regarding these loans and knew or should have known that Booth was taking out new loans to pay back old loans. Indeed, Cope openly joked that Booth was a "money launderer."

28.    Cope gave Booth entry into Bighorn, introduced Booth to other Bighorn members, gave Booth unfettered access to the Bighorn clubhouse, vouched for Booth and the Golf Cart Business despite Booth's unsavory past, and encouraged Bighorn members to invest in the Golf Cart Business by representing that he, Cope, was a participant in it to give the Golf Cart Business the appearance of legitimacy.

29.    At the same time, Booth and Cope shared exotic cars, private airplanes, and a conspicuous designer bag filled with large amounts of cash, which Cope and Booth used for, among other matters, high-stakes card games in the Bighorn clubhouse.

30.    To potential investors, Booth was direct about his history but represented that he had changed and now was running a legitimate business operation. Cope's vouching for Booth was necessary for Booth and Cope to attract victims to the Ponzi Scheme.

31.    In 2018, M. Earl Morley, Jr. ("Morley"), one of the first of the Bighorn investors Cope delivered to Booth, alerted Cope that Booth had defaulted on loans Morley and an LLC had provided.  Morley also told Cope that Booth had personally told him a series of lies involving an apocryphal cancer-addled daughter to explain the default, had begun to liquidate his storefront to avoid an imminent court issued injunction, and was rapidly closing the bank account used to run his business to avoid collection activities.

32.    *After* being informed of these facts, Cope opened a bank account with Hoffman, a young woman with whom Booth and Cope were simultaneously involved in intimate relations, in New Mexico (the "Ruidoso Account").  The Ruidoso Account replaced the account Booth had been using to run the Golf Cart Business.  Cope began running the financial transactions at the heart of the Ponzi scheme out of the Ruidoso Account; he explicitly took over the Ponzi scheme's financing, putting it in his own name.

33.    The Ruidoso Account allowed Cope and Booth to continue running the fraudulent investment operation after it should have collapsed given legal efforts undertaken by Morley and an LLC Morley managed to recover on their debts, including a preliminary injunction that would have otherwise shut down the financing of the scheme.

**Cope and Booth Target McGrath**

34.    Cope and Booth targeted McGrath, a wealthy Bighorn member.

35.    McGrath mistook Cope for a friend.  Cope and Booth represented to McGrath that Booth required short-term loans to purchase a fleet of golf carts to improve and sell for a profit. Cope represented that Booth was a legitimate businessman and was seeking investments for legitimate business purposes.

36.    These representations were false.  Booth never intended to use these monies to purchase a fleet of golf carts for sale, nor did he use funds received from McGrath (and others) for this purpose.

37.    McGrath reasonably relied on Cope's representations because of Cope's status as a prominent Bighorn member, which lent legitimacy to Cope's representations regarding Booth's business of selling high end golf carts to other Bighorn members.  McGrath was not aware, and had no reason to suspect, that Booth and Cope were operating a Ponzi scheme together or that Cope would later open the bank account through which the Ponzi scheme was run.  McGrath was not aware of Cope's "troubles," including Cope's "business setbacks," Cope's "drug problem that led to jail time," or Cope's tenuous finances.

38.    On January 17, 2018, relying in large part on Cope's representations and assurances as described above, McGrath entered a written promissory note ("January Promissory Note"),

pursuant to which McGrath loaned Booth $250,000 with interest to be paid at twenty-five percent (25%), with payment in full in the amount of $312,500 on that loan due on February 14, 2018.

39.     Those funds were not used to purchase a fleet of golf carts for sale; instead, Booth used the money to fund his extravagant lifestyle, paying for his membership to an elite club, his rent for a luxury condo at that elite club, private jet rentals, and to pay back previous investors he had bilked who were then demanding the return of their investments.  For his part, Cope rented private jets and took control of the pair's large designer bag filled with cash, which Cope and Booth used for such things as the high stakes card games in the Bighorn clubhouse.

40.     Booth did not repay the January Promissory Note loan when it became due.

41.     Instead, on February 21, 2018, Booth and McGrath entered into a letter agreement which called for the January Promissory Note loan to be repaid in full, with interest, on March 14, 2018.

42.     Thereafter, on March 6, 2018, McGrath entered a second promissory note with Booth ("March Promissory Note"), pursuant to which McGrath loaned Booth $180,000, with a twenty percent (20%) interest rate, to be repaid in full by Booth by April 6, 2018, in the amount of $216,000.

43.     At that time, Booth represented to McGrath that he needed additional funds to clear title on certain of his luxury automobiles, which he could then sell and use the proceeds to make the payments to McGrath required under both the January Promissory Note and the March Promissory Note.

44.     But the funds received from McGrath pursuant to the March Promissory Note were not used to clear title on certain of Booth's purported luxury automobiles, and instead were used to further fund Booth's and Cope's extravagant lifestyles.  Indeed, Booth testified under oath at

his deposition in another matter that he did not ever own any of the cars that he drove, he simply drove them with permission.

45.    Booth did not repay either loan when due.

46.    McGrath made repeated requests to Booth to repay those funds. Instead, in writing, Booth concocted a story involving an attorney named "John" who somehow controlled Booth's funds and prevented repayment.

47.    Booth's written explanations and excuses were false. His account contained sufficient funds to repay McGrath. Rather than do so, the funds flowed into the Ruidoso Account. In other words, funds from the account to which McGrath had transferred the proceeds of the January Promissory Note and the March Promissory Note, which should have used to pay back McGrath, instead were transferred to the Ruidoso Account, which Cope owned and operated.

48.    At the time that Booth failed to make the agreed payments to McGrath, McGrath did not know of and had no reason to know of Cope's involvement with the Ponzi Scheme. Indeed, McGrath and Cope remained friendly through 2018 and beyond.

## Cope Continues to Vouch for Booth to Prevent Discovery of the Ponzi Scheme and His Own Involvement

49.    On November 1, 2018, the *Desert Sun* published an exposé on Booth, reporting that numerous individuals had filed lawsuits complaining that they had invested money in the Golf Cart Business but had been swindled by Booth and his co-conspirators.[1] Saliently, that article did not identify Cope as a coconspirator or participant in the Ponzi scheme.

---

[1] https://www.desertsun.com/story/money/2018/11/01/investors-palm-springs-golf-cart-salesman-michael-booth-financial-ride/1089851002

50.    Upon information and belief, the publication of the *Desert Sun* exposé significantly hindered Cope, Booth, and their accomplices, including the Doe Defendants, from soliciting new investments into the Golf Cart Business.  Without an actual, profitable business, the operation's remaining funds quickly dried up and/or were fraudulently transferred to Booth and/or his co-conspirators, including the Doe Defendants.  These included a series of seven-figure transfers to various co-conspirators, leaving insufficient capital to repay the debts of the Golf Cart Business.

51.    Despite the publication of the article, Cope continued to make false assurances to McGrath that his loans would be repaid in the late fall and winter of 2018.

52.    Moreover, Cope continued to provide Booth with unfettered access to Bighorn into 2019, repudiating the article and defending Booth.

53.    While McGrath knew that Booth and Cope were friends, he had no idea that Cope had, among other acts, opened a bank account in New Mexico to operate the Ponzi scheme (*i.e.*, the Ruidoso Account), purchased luxury vehicles in his name with Ponzi scheme funds that he shared with Booth, taken cash from the Ponzi scheme for his own use and enjoyment, and paid settlement monies to protect the Ponzi scheme from liability that would end it.  McGrath therefore had no reason to disbelieve Cope's continued reassurances regarding Booth.

54.    Indeed, into 2019, Cope continued to publicly socialize with and provide Booth with unfettered access at Bighorn.  Cope steadfastly disavowed the article while assuring investors that Booth was engaged in legitimate business.  McGrath reasonably believed, based on his relationship with Cope, based on Cope's standing in the community, and based on Cope and Booth's express representations, that the only thing standing in the way of repayment of his debt was an attorney named "John."

**The Bank Transfers Reveal the Extent of Cope's Participation in the Ponzi Scheme**

55.    Although McGrath did not discover it until much later, Cope was an active participant in the Ponzi scheme.  Specifically, as noted above, Cope opened the Ruidoso Account in his own name and in the name of Camilla Hoffman, facts which were deliberately concealed from McGrath and other victims of this scheme.  The Ruidoso Account used the address of Cope's home in Ruidoso, New Mexico, eight miles from the Ruidoso Downs Race Track & Casino, where Cope had close ties and interests.

56.    The Ruidoso Account was a key component of the Golf Cart Business.  It allowed Booth and his accomplices, including Cope and the Doe Defendants, to continue running the fraudulent investment operation after it should have collapsed given legal efforts undertaken by Morley and the LLC he managed to recover on their debts.  Specifically, the issuance of a preliminary injunction should have prevented Booth from accepting and transferring golf carts and should have effectively frozen the Golf Cart Business' funds.  By moving the accounts from the name of one coconspirator, a business trust nominally controlled by Glessner named DMB-BT, to accounts in the name of two other coconspirators, Cope and Hoffman, the Golf Cart Business avoided the consequences of Morley and his LLC's legal action, of the injunction, and allowed them to continue their scheme almost uninterrupted.

57.    McGrath did not know and had no reason to know that Cope opened the Ruidoso Account in furtherance of the Ponzi scheme.

58.    Still further, though they knew of each other, McGrath and Morley were not friends and McGrath did not have occasion to speak with Morley to learn of Cope's intimate involvement in the scheme.  On the contrary, Cope and Booth iced Morley out of the social network at the

Bighorn, to a degree that Morley stopped attending the club except on rare occassions and moved his full-time residence to Nevada.

### Years Later, McGrath Learns of Cope's Involvement in the Ponzi Scheme

59.     McGrath remained friendly with Cope until his death on December 13, 2020.

60.     Though social distancing requirements in California borne from Covid-19 limited McGrath's use and access to Bighorn in 2020 and 2021 and put a pause to the social environment at the club, McGrath spent a great deal of time at the club in early 2022.

61.     It was not until early 2022 that McGrath first learned of Cope's active role in the Ponzi scheme.  Specifically, McGrath learned from Robby Pike, another member of the Bighorn and another victim of the scheme, that, to McGrath's shock, his friend Cope was not merely another victim duped by Booth, but was instead working in consort with him and profiting from the enterprise.  In or about February of 2022, McGrath learned for the first time that Cope had paid to settle Booth's litigation with Morley and the LLC Morley controlled to keep the Ponzi scheme going.  He learned for the first time that Cope had opened the Ruidoso Account.  He learned for the first time that an LLC that Pike controlled, Convoy Capital, had traced the funds that went into the Golf Cart Business to Cope's Riodoso Account.

62.     Accordingly, McGrath discovered that Cope was a participant the Ponzi scheme in or around February of 2022 by virtue of this information he gained.  Though he was aware of Booth's misdeeds and Glessner's participation, he had no way or reason to know of Cope's involvement (or of Hoffman's involvement).

### McGrath Obtains a Judgment Against Booth

63.     On September 4, 2020, McGrath commenced an action in the U.S. District Court for the District of Massachusetts against Booth and DMB-BT, the co-conspirators he knew at that

time, in the action entitled *McGrath v. Booth, et al.*, No. 20-CV-11651-FDS (D. Mass) (the "District Court Case"). This action sought recovery in connection with the defaults on the January Promissory Note and the March Promissory Note.

64.    Booth repeatedly evaded service in the District Court Case. On November 3, 2021, the clerk of the court entered a default against Booth and the other defendants.

65.    On December 1, 2022, McGrath moved the court for default judgment, seeking total damages of $3,107,195.43 plus interest and attorney's fees of $182,862.48 (the "Massachusetts Judgment"), which the Court ordered in McGrath's favor on January 20, 2023.

66.    Because of Cope's direct involvement with the Ponzi scheme, including his payment of settlement monies to avoid the scheme being revealed and the opening of the Ruidoso Account, Cope's Estate should be jointly and severally liable to McGrath in the same amount as the Massachusetts Judgment, which a trier of fact found represents the damage McGrath suffered as a result of the scheme.

**J.P. Cope and Brewer Begin Selling the Estate's Assets for Below Market Value**

67.    As a result of his participation in the Ponzi scheme, Cope was liable to all the investors he helped defraud, including McGrath. Upon his passing, the Estate remained liable to these persons.

68.    After Cope passed, J.P. Cope became the executor for the Estate. Upon information and belief, J.P. Cope was aware or should have been aware of Cope's and the Estate's liability to victims of the Ponzi scheme. For example, Cope had previously been named in an action filed by Bighorn Ventures LLC ("Bighorn Ventures"), the LLC via which Morley made certain loans to the Golf Cart Business. Additionally, the Estate was named as a defendant in a lawsuit filed by Convoy Capital LLC ("Convoy Capital"), the entity Robby Pike controlled. To avoid having to

use the Estate's assets to compensate the victims, the Estate, at J.P. Cope's direction, put into motion a scheme to liquidate certain assets at below-market nominal values while simultaneously engaging in side deals with the purchasers of those assets. Those side deals provided additional value to certain of the Estate's beneficiaries outside of the probate process or public scrutiny.

69.    On May 18, 2021, J.P. Cope, as executor of the Estate, entered an agreement to sell the Estate's residential property at 149 Netas Drive, Palm Desert, CA 92260 ("Bighorn Property"), unlisted, to Palowet Investments, LLC ("Palowet"), for $2.8 million. The Bighorn Property was worth far more than $2.8 million.

70.    Upon information and belief, Palowet knew that it was obtaining the Bighorn Property for below-market value. Upon information and belief, J.P. Cope entered into a valuable side deal with Palowet and/or with its sole member, Clay Hunt, in consideration of selling Palowet the Bighorn Property for such a low value. The consideration exchange in this side deal would ordinarily be out of the reach of creditors of the Estate, including McGrath.

71.    Brewer and the other beneficiaries of the Estate, including surviving members of the Cope family other than J.P. Cope, opposed the sale and attempted to block it.

72.    On September 30, 2021, J.P. Cope, Brewer, and the other beneficiaries of the Estate entered the Cope Family Settlement Agreement. Pursuant to that agreement, J.P. Cope stepped down as executor of the Estate and Brewer became the Executor. In addition, on completion of the sale of the Bighorn Property, J.P. Cope agreed to a reduced distribution from the Estate from $500,000 to $400,000.

73.    On November 8, 2021, the Estate initiated ancillary probate proceedings in Riverside County, California, the county in which the Bighorn Property is located ("Riverside County Probate Proceedings"). On March 24, 2022, Brewer, now acting as the Executor of the

Estate, filed a Notice of Proposed Action to close the sale of the Bighorn Property on the same terms previously agreed to by and between J.P. Cope and Palowet.  In April 2022, the Estate closed the sale of the Bighorn Property on those terms, at a price well below its market value.

74.     On July 28, 2022, the Estate filed the First and Final Report ("Final Report") in the Riverside County Probate Proceedings.  The Final Report lists a single account as the only asset of the Estate in Riverside County, which contained the proceeds of the sale.  In the Final Report, the Estate represented falsely that it had no anticipated liabilities, that it had no creditors, and that it had provided notice to all creditors and interested parties.  At that time, the Estate was a defendant in a lawsuit filed by Convoy Capital, a lawsuit that has since settled.  It has since acknowledged the existence of additional creditors.  The Estate failed to provide notice to all creditors and interested parties.

75.     On November 3, 2022, the Probate Court, unaware of the Estate's failures to properly provide notice to interested parties and unaware of the Estate's creditors, approved the Final Report.  This allowed the Estate to complete the fraud on its creditors.

76.     Upon information and belief, the Estate did not provide notice of the Riverside County Probate Proceedings or of the sale of the Bighorn Property to any of the Estate's known or potential creditors or interested parties.

77.     In addition, the Estate owned an interest in an airport hangar.  Upon information and belief, J.P. Cope, then-acting as executor of the Estate, sold the interest in that hangar for well below market value.

78.     Upon information and belief, J.P. Cope and/or Brewer have liquidated other assets of the Estate for well below market value in order to prevent creditors of the Estate from recovering amounts owed.  J.P. Cope and potentially other beneficiaries of the Estate have also benefited by

entering valuable side agreements with the counterparties to the sales of Estate assets. In sum, J.P. Cope has personally benefitted from these side deals meant to enrich him at the expense of other creditors to the Estate and Brewer has, at the very least, willingly and knowingly ratified these self-serving transactions intended to defraud creditors to the benefit of insiders.

## V.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### FRAUD (AGAINST THE ESTATE)

79.    Plaintiff re-alleges and incorporates all allegations set forth above and below.

80.    Cope falsely represented to McGrath and many other potential investors that the Golf Cart Business was a legitimate, lawful enterprise, that Booth was trustworthy, and that the funds loaned to the Golf Cart Business would be used solely to finance the purchase of equipment and other operations of the Golf Cart Business.

81.    Cope's false representations were made knowingly or recklessly because Cope was at all times aware that his statements were false when he made them or he willfully ignored red flags and warning signs, including from Morley, that should have made him aware that his statements were false.

82.    Cope made the false representations with the intent to deceive McGrath.

83.    McGrath reasonably relied on Cope's false representations when he was duped into investing in the Golf Cart Business and entered into the January Promissory Note and the March Promissory Note..

84.    McGrath acted to his detriment in making the loans to the Golf Cart Business, which defaulted on both of the loans in full, damaging McGrath in a sum the District Court of Massachusetts determined totaled $3,107,195.43 (*i.e.*, the Massachusetts Judgment).

85.    McGrath did not know of and had no reason to know of Cope's fraudulent intent or of Cope's involvement in the fraudulent scheme at the time Cope made the representations or when Booth failed to repay the loans due under the January Promissory Note and the March Promissory Note.  McGrath did not learn of Cope's direct involvement in the fraudulent scheme until early 2022.  At the earliest, McGrath *could* have learned about Cope's involvement in or about August of 2020, when he retained counsel who had previously represented Morley and the LLC that Morley controlled, though McGrath did not learn of these facts at that time.

86.    Cope's acts were willful, fraudulent, and malicious such that punitive damages should issue against the Estate.

### SECOND CAUSE OF ACTION

### CIVIL CONSPIRACY (AGAINST THE ESTATE)

87.    Plaintiff re-alleges and incorporates all allegations set forth above and below.

88.    Booth, Hoffman, and Cope, and the Doe Defendants, conspired with one another to misappropriate funds from McGrath and other investors through the fraudulent Golf Cart Business scheme in the manner described above.

89.    Cope carried out specific wrongful acts pursuant to the conspiracy, including making false representations to and concealing material facts from investors, including McGrath, vouching for Booth to induce them to "loan" funds to the Golf Cart Business, and opening, maintaining and using the Ruidoso Account in Cope's own name to facilitate the transfer of funds in connection with the Golf Cart Business scheme.

90.    McGrath was damaged as a result of the conspiracy to a sum the District Court of Massachusetts determined totaled $3,107,195.43.

91.    McGrath did not know of and had no reason to know of Cope's intent to further the unlawful purpose of the conspiracy or of Cope's involvement in the conspiracy at the time Cope and Booth solicited McGrath.  McGrath did not learn of Cope's direct involvement in the conspiracy until 2022.  At the earliest, McGrath *could* have learned about Cope's involvement in or about August of 2020, when he retained counsel who had previously represented Morley and the LLC that Morley controlled, though McGrath did not learn of these facts at that time.

92.    Cope's acts were willful, fraudulent, and malicious such that punitive damages should issue against the Estate.

### THIRD CAUSE OF ACTION

### VIOLATION OF THE NEW MEXICO UNFAIR PRACTICES ACT (AGAINST THE ESTATE)

93.    Plaintiff re-alleges and incorporates all allegations set forth above and below.

94.    As a resident of New Mexico who conducted business in New Mexico, including opening, maintaining and using a bank account in New Mexico for financial transactions related to the Golf Cart Business and scheme, Cope, and therefore, his estate was subject to the New Mexico Unfair Practices Act ("NMUPA").  N.M. Stat. Ann. § 57-12-1 et seq.

95.    The NMUPA provides a private right of action for "[a]ny person who suffers any loss of money or property" as a result of an unfair trade practice.  Id. § 57-12-10(B).   An "unfair or deceptive trade practice" is defined as "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services or in the extension of credit or in the collection of debts by a person in the regular course of his trade or commerce, which may, tends to or does deceive or mislead any person."  Id. at § 57–12–2(D).

96.    Cope made oral statements and other misrepresentations that were "false or misleading," as those terms are defined under the NMUPA.  In particular, in early 2018, Cope falsely represented to McGrath and many other potential investors that the Golf Cart Business was a legitimate, lawful enterprise, that Booth was trustworthy, and that the funds loaned to the Golf Cart Business would be used solely to finance the purchase of equipment and other operations of the Golf Cart Business.

97.    Cope's false and misleading representations were "knowingly made" because, upon information and belief, Cope was actually aware that the statements were false and misleading when made or, in the exercise of reasonable diligence, should have been aware that the statements were false and misleading.

98.    Cope's false and misleading statements were made in connection with the "extension of credit or in the collection of debts."  That is, the short-term debt instruments being offered by the Golf Cart Business to investors, including McGrath, meet the requisite definition under the NMUPA.

99.    Cope's misconduct occurred in "the regular course of his trade or commerce." Cope was an active participant in the Golf Cart Business investment scheme and made the same or similar false and misleading representations to numerous potential investors in furtherance thereof.

100.    Cope's false and misleading representations were of the type that "may, tend[] to or d[id] deceive or mislead any person."  Saliently, Cope's misrepresentation about the legitimacy of the Golf Cart Business, the purpose of the investment, and Booth's trustworthiness deceived McGrath and many other investors.

101.    Cope willfully engaged in the unlawful trade practices described above.

102.    As a result of Cope's willful violations of the NMUPA, McGrath is entitled to an award of up to three times actual damages, as well as an award of attorney's fees and costs.  Id. § 57–12–10(B) and (C).

103.    McGrath did not know of and had no reason to know of Cope's fraudulent intent or of Cope's involvement in the Ponzi scheme at the time Cope made the representations or when Booth failed to repay the loans due under the January Promissory Note and the March Promissory Note.

**FOURTH CAUSE OF ACTION**

**VIOLATION OF THE NEW MEXICO UNIFORM SECURITIES ACT (AGAINST THE ESTATE)**

104.    Plaintiff re-alleges and incorporates all allegations set forth above and below.

105.    The New Mexico Uniform Securities Act ("NMUSA") prohibits the offer or sale of unregistered securities unless they are exempt.  N.M. Stat. § 58-13C-301.

106.    The debt instruments that the Golf Cart Business, through Booth and Cope, offered and sold to McGrath constitute "securities" within the meaning of the NMUSA.  Id. § 58-13C-102(DD).

107.    The Golf Cart Business did not register the debt instruments and they are not exempt from registration under the NMUSA.

108.    Cope is liable to McGrath for selling a security in violation of Section 301 of the NMUSA.  Id. § 58-13C-509(B).

109.    To the extent that Cope did not himself "sell" the unregistered securities to McGrath, Cope is "liable jointly and severally with and to the same extent as" the seller of the security because Cope was "associated" with the seller and materially aided the conduct giving rise to liability.

110.    McGrath did not know of and had no reason to know of Cope's association with or of Cope's involvement in the scheme to unlawfully sell securities at the time of the sale in or about January and March 2018.  McGrath did not learn of Cope's direct involvement in the illicit selling of these securities until 2022, the earliest he *could* have learned of his involvement was in or about August of 2020, when he retained counsel who had previously represented Morley and the LLC that Morley controlled, though McGrath did not learn of these facts at that time..

### FIFTH CAUSE OF ACTION

**FRAUDULENT TRANSFER (AGAINST THE ESTATE, BREWER, AND J.P. COPE)**

111.    Plaintiff re-alleges and incorporates all allegations set forth above and below.

112.    The Estate is a debtor within the meaning of Texas Uniform Fraudulent Transfer Act, Tex. Bus. & Com. Code § 24.002.

113.    McGrath is a creditor of the Estate within the meaning of the Texas Uniform Fraudulent Transfer Act, Tex. Bus. & Com. Code § 24.002.

114.    Cope became liable to McGrath when he made false representations and induced McGrath to invest in the Golf Cart Business, knowing that it was a Ponzi scheme.

115.    The Estate became liable to McGrath upon the passing of Cope.

116.    The Estate, acting through and with J.P. Cope and Brewer, sold off its assets, including the Bighorn Property, its interest in the airport hangar, and others, for far less than market value.

117.    J.P. Cope and potentially other beneficiaries of the Estate entered into beneficial side agreements with the counterparties to the sales of the Estate's assets.  Accordingly, the counterparties to these sales were aware that they were not paying reasonably equivalent value for those assets.  None of these counterparties are persons who took in good faith and for a reasonably

equivalent value, within the meaning of the Texas Uniform Fraudulent Transfer Act, Tex. Bus. & Com. Code § 24.009.

118.    The Estate, acting through and with J.P. Cope and Brewer, entered these transactions with the actual intent to hinder, delay, or defraud creditors of the Estate, including McGrath.

119.    The Estate did not receive reasonably equivalent value for the assets it sold.

120.    The Estate, J.P. Cope, and Brewer were all aware or should have reasonably been aware that the Estate would be unable to pay its obligations to the victims of the Ponzi scheme as those obligations became due.

121.    Therefore, the Estate's transfers, completed by and through J.P. Cope and Brewer, were fraudulent transfers within the meaning of Texas Uniform Fraudulent Transfer Act, Tex. Bus. & Com. Code §§ 24.005 and 24.006.

122.    Under the Texas Uniform Fraudulent Transfer Act, Tex. Bus. & Com. Code § 24.008, McGrath is entitled to avoidance of the transfers or to actual damages up to the total amount owed by the Estate for the underlying claims, which damages the District Court of Massachusetts determined totaled $3,107,195.43, including treble and punitive damages.

123.    McGrath is also entitled to costs and attorney's fees pursuant to Texas Uniform Fraudulent Transfer Act, Tex. Bus. & Com. Code § 24.013.

### SIXTH CAUSE OF ACTION

#### CIVIL CONSPIRACY (AGAINST THE ESTATE, BREWER, AND J.P. COPE)

124.    Plaintiff re-alleges and incorporates all allegations set forth above and below.

125.    Not only is the Estate jointly and severally liable to McGrath for the damages suffered as a result of Cope's Ponzi scheme, but the Estate, and Brewer and J.P. Cope, individually,

are jointly and severally liable to McGrath for the damages caused by the scheme to liquidate certain Estate assets at below-market value in exchange for side deals that benefited J.P. Cope and potentially other beneficiaries of the Estate to detriment of creditors, including McGrath.

126.    Brewer and J.P. Cope are beneficiaries of the Estate.  Each served at different times as executors of the Estate.  After Brewer replaced J.P. Cope and became the Executor, Brewer proceeded to close the sale of the Bighorn Property to Palowet in a deal structured specifically to defraud the McGrath and other creditors of the Estate.  Brewer and J.P. Cope worked in concert, individually and in their representative capacities, to carry out these wrongful acts.

127.    Brewer and J.P. Cope were aware of the potential liability to McGrath arising from Cope's Ponzi scheme due to other civil actions filed by other victims of that scheme, including by Bighorn Ventures and Convoy Capital.  As such, J.P. Cope and Brewer were on notice that other creditors would likely be filing similar claims against the Estate and were aware that the Estate lacked sufficient assets to satisfy the claims of existing and potential creditors.

128.    Based on their knowledge of then existing and potential creditors' claims and the alleged circumstances of Cope's involvement in the Ponzi scheme, Brewer and J.P. Cope were aware that delay in distributing the Estate's assets among the beneficiaries would potentially result in the reduction or elimination of any inheritance they might ultimately receive.

129.    The Bighorn Property was one such asset of the Estate.  Because it was located in Riverside County, California, it could be distributed separately (and more quickly) from the distribution of the rest of the Estate through the ancillary Riverside County Probate Proceedings. The Estate, Brewer, and J.P. Cope just needed to find a willing counterparty for their scheme.

130.    Palowet proved to be the willing counterparty.  It agreed to purchase the Bighorn Property at far less than market value. In return, on information and belief, Palowet entered beneficial side agreements with J.P. Cope and potentially other beneficiaries of the Estate.

131.    As such, the Estate, acting first through J.P. Cope and ultimately through Brewer, and Palowet came to an agreement to engage in a course of action designed to evade the ability of potential creditors – including McGrath – to reach the Estate's assets.

132.    Specifically, the Estate sold the Bighorn Property to Palowet for far less than market value.  The aim of this transaction was to ensure speedy access to cash that could be distributed among the Estate's beneficiaries in the hopes of preventing recovery by the Estate's creditors prior to distribution among the beneficiaries.  It also on information and belief ensured that J.P. Cope would, through side deals, take assets from the Estate that would otherwise be owed to creditors.

133.    Brewer and J.P. Cope caused the Estate to sell other assets, including its interest in the airport hangar, for far less than market value to ensure speedy access to cash that could be distributed among the Estate's beneficiaries in the hopes of preventing recovery by the Estate's creditors prior to distribution among the beneficiaries.

134.    J.P. Cope and Brewer entered into beneficial side agreements with the counterparties to the sales of the Estate's assets.  Accordingly, the counterparties to these sales were aware that they were not paying reasonably equivalent value for those assets.  None of these counterparties are persons who took in good faith and for a reasonably equivalent value.

135.    The Estate, acting through and with J.P. Cope and Brewer, entered these transactions with the actual intent to hinder, delay, or defraud creditors of the Estate, including McGrath.

136.    The Estate did not receive reasonably equivalent value for the assets it sold and J.P. Cope and Brewer engaged in these transactions to quickly liquidate and take the Estate's assets, including through side deals, to avoid forthcoming creditor's claims.

137.    As beneficiaries of the Estate, J.P. Cope and Brewer directly profited as a result of this conspiracy and the underlying fraudulent transfers, which were made in an attempt to shield Estate assets from other potential creditors of the Estate, including McGrath.

138.    McGrath was damaged as a result of Brewer and J.P. Cope's conspiracy because their conduct potentially renders the Estate judgment proof.

139.    This conduct was willful, wanton and malicious and was undertaken with an intent to defraud such that punitive damages should issue.

## VI.    PUNITIVE DAMAGES

140.    McGrath is entitled to punitive damages because Cope's and all Defendants' conduct was malicious, willful, reckless, wanton, fraudulent and in bad faith.

## VII.    CONDITIONS PRECEDENT MET

141.    All conditions precedent to McGrath's suit herein have been met or occurred.

## VIII.    JURY DEMAND

142.    McGrath demands a trial by jury and will tender the appropriate fee.

## PRAYER FOR RELIEF

McGrath respectfully requests that this Court issue citation for Defendants to appear and answer, and that McGrath be awarded a judgment against Defendants for the following:

(a)    Actual damages in an amount according to proof, but no less than $3,107,195.43;

(b)    Pre- and post-judgment interest;

(c)    Treble damages for Cope's willful and knowing violations of NMUPA;

(d)  Avoidance of any transfers made by the Estate up to McGrath's total damages, including treble and punitive damages;

(e)  Recovery against Brewer and J.P. Cope personally, jointly and severally.

(e)  Punitive damages in an amount according to proof;

(f)  McGrath's attorney's fees and costs in bringing this suit pursuant to N.M. Stat § 57-12-10(C), N.M. Stat. § 58-13C-509(B)(1), and Tex. Bus. & Com. Code § 24.013; and

(g)  Such other and further relief as the Court deems just and proper.

Respectfully submitted,

**VENABLE LLP**
2049 Century Park East, Suite 2300
Los Angeles, CA 90067
(310) 229-9654
Fax: (310) 229-9901

By:

Ryan Lapine
CA State Bar No. 239316
rmlapine@venable.com
*[pro hac vice forthcoming]*

Rodney S. Lasher
CA State Bar No. 307462
rslasher@venable.com
*[pro hac vice forthcoming]*

Rachel E. Conover
CA State Bar No. 344495
reconover@venable.com
*[pro hac vice forthcoming]*

- and –

**FIELD, MANNING, STONE, HAWTHORNE & AYCOCK, P.C.**
415 West Wall Street, Suite 325
Midland, Texas 79701
(432) 687-0011
Fax: (432) 687-1735
By: */s/ Pat Long-Weaver*
Patricia Long-Weaver
State Bar No. 12521975
plongweaver@thebasinattorneys.com